R. PATRICK JARESS    #1028-0
737 Bishop Street, Suite 2920
Honolulu, Hawaii 96813
Telephone:  (808) 531-3151
Facsimile: (808) 531-6064
E-mail: patjaress@hotmail.com

RONALD K. KOTOSHIRODO    #3219
1001 Bishop Street, Suite 987
Honolulu, Hawaii 96813
Telephone: (808) 545-7700
Facsimile: (808) 545-7100
E-mail: rkkotoshirodo@msn.com

Attorneys for Trustee MARK J.C. YEE

JOHN RAPP  #1164
737 Bishop St., Suite 2920
Honolulu, Hawaii 96813
Telephone: (808) 531-3151
Facsimile: (808) 531-6064
E-mail: john_rapp@hotmail.com

Attorney for VALUE RECOVERY
GROUP, L.P., AS ASSIGNEE OF
THE FEDERAL DEPOSIT
INSURANCE CORPORATION,
RECIEVER OF SOUTHERN
PACIFIC BANK

**LODGED**

JUN 2 4 2004

CLERK, U. S. DISTRICT COURT
DISTRICT OF HAWAII

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JUL 0 1 2004

at_____o'clock and ___ min.___M.
WALTER A.Y.H. CHINN, CLERK

ATTEST: A True Copy
WALTER A.Y.H. CHINN
Clerk, United States District
Court, District of Hawaii
By_____
Deputy

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

In re:  HAWAIIAN GROCERY
STORES, LTD., a Hawaii
corporation,

                        Debtor.

_____

) CIVIL NO.  02-00668 BMK
)
)
) Bankruptcy Case No.  99-05157
)
) (Chapter 7)
)

EXHIBIT "B"

MARK J.C. YEE, ) Adv. Pro. No. 01-00057
Trustee for the Bankruptcy )
Estate of Hawaiian Grocery Stores, )
Ltd., and VALUE RECOVERY ) THIRD AMENDED COMPLAINT;
GROUP, L.P., AS ASSIGNEE OF ) EXHIBITS 1 AND 2; SUMMONS;
FEDERAL DEPOSIT INSURANCE ) CERTIFICATE OF SERVICE
CORPORATION, RECIEVER OF )
SOUTHERN PACIFIC BANK )
)
)
                    Plaintiff, )
)
)
    vs. )
UNIFIED WESTERN GROCERS, )
INC., CERTIFIED GROCERS OF )
CALIFORNIA, LTD., GROCERS )
SPECIALTY COMPANY, RHL, )
INC., ALFRED A. PLAMANN, )
CHARLES PILLITER, DANIEL T. )
BANE, ROBERT M. LING, DAVID )
A. WOODWARD; RICHARD H. )
LOEFFLER, FLETCHER ROBBE, )
GOODSILL ANDERSON QUINN )
AND STIFEL*, SHEPPARD )
MULLIN RICHTER & HAMPTON, )
BRUCE BARBER, DOES 1-10, )
)
                    Defendants. )
_____ )

## THIRD AMENDED COMPLAINT

MARK J.C. YEE ("Plaintiff"), Trustee for the bankruptcy estate of Hawaiian

Grocery Stores, Ltd. ("HGS"), and an assignee** of the State of Hawaii, and Value

Recovery Group, L.P., as Assignee of the Federal Deposit Insurance Corporation,

_____
* The claims against Goodsill have been dismissed.
** Language retained to preserve appeal rights.

2

Receiver of Southern Pacific Bank, for a claim for relief against Defendants above named, alleges and avers as follows:

1.    Plaintiff Yee ("Plaintiff") is the duly qualified and acting chapter 7 Trustee of the estate of the above-named debtor, and is the assignee of the claims of the State of Hawaii.**

2.    Value Recovery Group, L.P. is the Assignee of the Federal Deposit Insurance Corporation, which is Receiver of Southern Pacific Bank, including its division or subsidiary, Coast Business Credit ("Coast"), and is owner of the claims of Coast against Defendants.

3.    Defendant Alfred A. Plamann, was an officer and Director of HGS during the month of May, 1996.

4.    Defendant Charles Pilliter was an officer and Director of HGS during the month of May, 1996.

5.    Defendant Daniel T. Bane was an officer and Director of HGS during the month of May, 1996, and a Director thereafter.

6.    Defendant Robert M. Ling, Jr. was an officer of HGS during the month of May, 1996.

7.    Defendant David A. Woodward was an officer and Director of HGS

---

** Language retained to preserve appeal rights.

16.     Defendant Sheppard Mullin Richter & Hampton ("S-M") is a law firm located in California that provided legal services to Certified, Grocers Specialty, and HGS in connection with the series of interrelated transactions occurring on and after May 1996 relating to a leveraged buyout of HGS stock.

17.     Defendant Bruce Barber is an individual who has a financial background, served as a high ranking officer of HGS, and is presently facing criminal charges in connection with his HGS activities.

### Background Facts

18.     In 1989, HGS estimated the value of its common stock for a possible merger with Certified who planned to purchase HGS stock from the HGS shareholders.

19.     This valuation served as the basis for the merger through the common shareholders sale of their interest to Certified for $2,314,036.50 on January 16, 1990.

20.     Certified, through its wholly-owned subsidiary, Grocers Specialty, acquired all of the equity shares (1,603.9 shares of common stock) of HGS for $2,314,036.50 on January 16, 1990.

21.     Certified's acquisition all of the common stock of HGS, gave

14.    Defendant Grocers Specialty Company ("Grocers Specialty") is a former wholly owned subsidiary and alter ego of Defendant Certified and is now a subsidiary of Defendant Unified Grocers.

15.    Defendant Does 1-10 are individuals or entities that intentionally, recklessly, negligently, and/or otherwise who conspired and/or participated in the wrongful activities alleged below in the capacity of an officer and/or a director, of a defendant or in the capacity of an attorney, Certified Public Accountant and/or firm, but whose names are not known and/or the extent of their conduct is not known to the extent necessary to include such conduct in the complaint at the time of the filing of the complaint, and the Plaintiff asks leave of the court under Rule 17 of the Hawai'i Rules of Civil Procedure.  Plaintiff has made reasonable inquiries into the identities of said persons and entities by interviewing accountants, attorneys and others associated with the bankrupt debtor, and has read the documents and records that have so far been gathered belonging to or regarding the bankrupt debtor, and has so far learned of a pattern of wrongful conduct has occurred causing massive losses to the bankrupt debtor, but does not yet know the identities of all such persons and entities that participated in the wrongdoing and seeks leave to insert the true identities when they are discovered.

during the month of May, 1996.

8.    Defendant RHL, Inc. was a Hawaii based company and alter ego of Richard H. Loeffler, who became an officer and director of HGS in the month of May, 1996.

9.    Defendant Richard H. Loeffler, was a Honolulu resident and officer and Director of HGS from May 1996 until at least the time of the Ch. 7 Bankruptcy.

10.    Defendant Fletcher Robbe was a California attorney for HGS in the month of May, 1996 and thereafter until HGS went into bankruptcy on December 15, 1999.

11.    Defendant Goodsill, Anderson, Quinn and Stifel, is a Honolulu law firm, and was an attorney for HGS before the month of May, 1996, during the month of May 1996, and after the month of May, 1996.[*]

12.    Defendant Certified Grocers of California, Ltd. ("Certified") the controlling shareholder of HGS before, during and after the month of May 1996.

13.    Defendant Unified Western Grocers, Inc. ("Unified Grocers") is a California corporation and the successor in interest to Defendant Certified Grocers of California, Ltd. ("Certified").

---

[*] The claim against Goodsill has already been dismissed.

Certified 100% controlling interest of HGS.

22.    Certified had the power to elect the board members who oversaw all the major decisions made by management.

23.    During the following six years, Certified managed HGS as its wholly owned subsidiary. During this six-year period, Certified claims to have invested over $7 million into HGS.

24.    HGS' financial condition deteriorated during the last two years (1995 and 1996) under Certified's management.

25.    HGS did not generate a positive cash flow from its operating activities; it had cash deficiencies from operating activities of about $542,000 in 1995 and $651,000 in 1996 (computed on a net change in balance sheet basis).

26.    HGS was simply burdened with too much debt for a company its size.

27.    HGS faced irreversible insolvency and liquidation unless it could recapitalize and greatly expand its share of the local market, which seemed unlikely.

28.    Defendant Certified through Grocers Specialty then embarked on a series of transactions (the "Transactions") to take as much money as possible out of HGS before it collapsed.

29.    The Transactions rendered HGS insolvent.

30.    Pursuant to the Transactions, key employees and officers of Certified appointed themselves as the majority directors of HGS on or about May 14, 1996.

31.    Certified, through its officers, directors, and agents, claimed to have amended the article of incorporation of HGS by way of an amendment purportedly consented to by the sole owner of HGS on May 14, 1996.

32.    The Articles of Amendment ("Articles") were prepared with the intent to file them at the Department of Commerce and Consumer Affairs for the State of Hawaii and had to be signed by two officers of HGS.

33.    The Articles of Amendment were first drafted and signed by defendant Woodward and Bane as an incomplete written instrument, because the Articles, as drafted, required additional matter be included in order to create a complete written instrument.

34.    Defendants Woodward and Bane then falsely endorsed the incomplete written instrument because the issuing commercial establishment, Grocers Specialty Company, did not authorize the making of the written instrument at the time it was signed.

35.    Shortly after the Articles in the form of an incomplete written instrument were signed, Certified, acting through one or more of the agents, attorneys, or employees, falsely completed the Articles by adding the date when

8

the shareholder of HGS ostensibly consented to the action and by falsely altering by erasure or obliteration ~~of~~ the date the articles ~~were~~ purportedly were signed, which was May 8, 1996.

36.    At or about the same time the articles of amendment were altered by obliteration of the number "8," Certified caused the insertion into the resulting blank space the number "14".

37.    May 14, 1996 is the same day the document incorrectly claims action was taken by the sole shareholder of HGS consenting to amend the Articles.

38.    The Articles were offered for filing at the Department of Commerce and Consumer Affairs for the State of Hawaii.

39.    The Articles were filed in relationship to the issuance of stock, stock dividends, stock warrants, and changes in the rights of the stockholders of HGS.

40.    The inclusion of the date May 14, 1996 as the date on which the shareholder consented to the Articles and the date the Officers attested to the action being taken is an incorrect date and was done intentionally, knowingly, recklessly or negligently.

41.    The two endorsers that attested to the accuracy lacked authority to sign the Articles on that date.

42.    The transaction between HGS, RHL Management Group, Inc., and

Grocers Specialty did not constitute arms length bargaining because Certified through Grocers Specialty and otherwise controlled HGS at the time that the loan transaction was prepared and was part of a three-way transaction whereby HGS transferred $2.4 million to Certified by direct transfer of cash and received no consideration and issued a $5.3 million secured note for shareholder equity.

43.    Later, Certified's directors, officers, attorneys and agents of HGS then created new financial instruments in HGS and shifted the control of the company from the owners of common stock to the owners of other instruments.

44.    The new financial instruments that provided control over HGS included the following:

      a.    Promissory Note for $5.3 million payable by HGS to Certified;

      b.    Security Agreement between HGS and Certified;

      c.    Rights Agreement among HGS, RHL, and Certified;

      d.    Supply Agreement between HGS and Certified;

      e.    Warrant Agreement between HGS and Certified that was issued as a stock dividend;

      f.    Sublease between HGS and Certified;

      g.    Preferred Stock issued as a stock dividend by HGS to Certified.

45.    In a corporation, the value of control depends on the shareholder's ability to exercise any or all of a variety of rights typically associated with control.

10

Certified as compared to RHL, maintained the following common prerogatives associated with control of a corporation:

    a.    Certified controlled the appointment or changes in operational management of HGS;

    b.    Certified controlled the appointment or change of members of the HGS board of directors; RHL was entitled to elect only a minority number of directors upon HGS' default for failure to pay any monies due and owing under its notes, supply agreements or sublease;

    c.    Certified determined management compensation and perquisites;

    d.    Certified set the operational and strategic policy and could change the course of the business of HGS;

    e.    Certified controlled the decision to acquire, lease, or liquidate business assets, including plant, property and equipment;

    f.    Certified selected suppliers, vendors, and subcontractors with whom HGS did business and awarded contracts;

    g.    Certified controlled the negotiations and consummated mergers and acquisition for HGS;

    h.    Certified controlled the decision to liquidate, dissolve, sell out, or recapitalize HGS;

    i.    Certified controlled the selling or acquisition of treasury shares;

    j.    Certified registered HGS' debt securities for an initial or secondary public offering;

k.   Certified declared and paid cash and/or stock dividends;

l.   Certified could change the articles of incorporation and bylaws;

m.   Certified set its own compensation and compensation of related party employees;

n.   Certified controlled the selection of the joint ventures and entered into joint venture and partnership agreements;

o.   Certified decided what products and/or services HGS would offer and pricing of those items;

p.   Certified controlled to block any or all of the above items.

46.   The new directors created the Attachment to Articles of Amendment of HGS (May 14, 1996) to give Certified, as the preferred stockholder, greater voting rights than RHL, the common stockholder.

47.   Item 4d of the Attachment to Articles of Amendment of HGS provided that approval by Certified is required for the significant controlling events over HGS' operations.  Additionally, these stock voting provisions also insured the control structure would be permanent

48.   Certified's approval was required for any issuance of preferred stock which would if issued may dilute Certified's preferred stock control.

49.   Certified's, and not RHL's, approval was required in the following significant controlling events over HGS' operations:

    a.  any voluntary liquidation, dissolution or winding up of the corporation

    b.  Any sale, lease, exchange, or other disposition of all or substantially all of the property and assets, with or without goodwill, of the corporation;

    c.  Any reorganization or recapitalization of the stock of the corporation; any declaration and/or payment of a dividend or distribution to any common stock shareholder(s);

    d.  Any issuance of preferred stock;

    e.  Any acquisition of the assets of, or equity in, another equity;

    f.  Any borrowing from a non-institutional third-party lender;

    g.  Any setting of an executive salary for an individual employee in excess of $125,000 annually;

    h.  Any hiring or termination of the lead marketing employee of the corporation;

    i.  Any hiring or termination of the Chief Executive Officer and President of the corporation.

50.    Upon HGS' default for failure to pay any monies due and owing under the Promissory Note, Supply Agreement and/or Sublease, Certified was entitled to elect a majority number of directors.

51.    The above areas of control demonstrate Certified's continued maintenance of control of HGS after the common stock was transferred to RHL.

52.    Certified continued to exercise all the rights associated with

controlling HGS' operations.

53.     Certified retained its control over all aspects of HGS' operations. Certified also controlled HGS' operations through its preferred stock rights granted by the HGS Board, its $5.3 million secured note with HGS, and other Board authorized agreements.

54.     Certified's supply agreement required HGS to purchase at least five percent of its total purchases from Certified.

55.     It required HGS to submit quarterly financial statements to Certified.

56.     Certified's sublease of the HGS premises required the payment of interest and principal to Certified on its $5.3 million note.

57.     Certified secured a line of credit for HGS with Congress Financial Corporation (Western).

58.     On May 28, 1996, Congress Financial agreed to provide a revolving loan to HGS of $4,500,000 for a term of two years (until May 1998).

59.     Certified obtained the approval of Congress Financial to use this loan to pay Certified $2,425,387 for what Certified labeled "a sale-of-stock transaction."

60.     These directors then set up the conduit that Certified needed to move $2,425,387 from HGS to Certified.

14

61.    This conduit required the cooperation of Richard Loeffler, whom these directors had just hired as president of HGS for a salary of $125,000, plus reimbursement of certain of his personal expenses including the rent on his home, the lease on his Jaguar, and payments of his credit cards.

62.    These directors elected Richard Loeffler as its president effective immediately after Certified relinquished its ownership interest in HGS.

63.    These directors continued their control over HGS and resolved that, after Certified relinquished its ownership interest in the common stock of HGS, the new president, Richard Loeffler, is directed to execute, deliver and consummate in HGS' behalf, the Promissory Note for $5.3 million to Certified, the Security Agreement, Rights Agreement, Supply Agreement, Sublease and any applicable financing documents with RHL's or HGS' lenders.

64.    Certified converted on May 28 1996, its $5.3 million investment in its wholly owned HGS subsidiary into a promissory note, and secured it with substantially all of the assets of HGS.

65.    Certified succeeded in placing the recovery of its investment in HGS before the interests of HGS' general creditors.

66.    The new Certified promissory note required quarterly payments of interest at 6.5 percent through May 31, 1999.

67.    Thereafter, the note required further cash withdrawals by requiring HGS to also make principal payments in equal quarterly installments of $331,250 on the $5.3 million principal balance.

68.    The line of credit agreements of both Congress Financial Corporation (Western) and Coast Business Credit specify that this note be classified as a capital contribution (equity) and not as debt.

69.    This note does not reduce the borrowing amounts that HGS could draw under its lines of credit.

70.    This note was considered as a capital contribution or as an investment of Certified into HGS.

71.    The directors of Certified also directed HGS to issue $1 million of preferred stock to Certified as a stock dividend.

72.    Preferred stock is a class of ownership in HGS with a stated dividend that must be paid before dividends can be paid to common stockholders.

73.    In the event of liquidation, Certified, the preferred shareholder, is paid off before RHL Management Group, the common shareholder.

74.    Certified owned 100 percent of the HGS preferred stock.

75.    The preferred stock dividends were 5 percent ($50,000) for 1996 and 1997, and increased by a full point each year thereafter until it reached 10 percent.

16

76.    The thin margin that HGS earned all went towards satisfying the preferred stock dividend owed to Certified.

77.    Nothing was left for the common stock holder (RHL Management Group, Inc.)

78.    Certified then planned to take as much money as it could out of HGS before it eventually was liquidated.

79.    This would increase the amount of losses eventually suffered by the unsecured creditors of HGS in three ways:

    a.    Cash was directly taken from HGS with no value being given back to HGS;

    b.    Useless operating expenses continued while the plan was being implemented to give the appearance HGS was a going concern;

    c.    Aides, abettors, and conspirators of Certified were provided money and opportunities to take assets from HGS for their cooperation with the plan.

80.    Certified wanted to withdraw $2,425,387 from a financially ailing HGS.

81.    Therefore, Certified entered into a scheme whereby it would hire Loeffler as president of HGS for a salary of $125,000, plus a bonus and transfer its common stock in HGS to him, at no cost to him.

82.    In return he would follow through on the Certified scheme to

17

withdraw the cash from HGS and give it to Certified for essentially worthless stock.

83.    Certified's plan involved several devices.

84.    First was a leveraged buy out in which HGS would pledge its assets to secure a line of credit that HGS drew down on to pay $2.4 million to Certified.

85.    Next, the plan called for HGS passing the money through a company of its new president, RHL Management Group, which, in turn, passed it to Certified.

86.    The result of this transaction was that HGS now had a new $2.4 million secured debt on its books, Mr. Loeffler received 10,000 shares of common stock of HGS, and Certified received $2.4 million.

87.    No expected income was available to HGS' common shareholder after Certified created the new financing documents in May 1996.

88.    HGS' expected earnings after Certified restructured its finances by creating such things as the preferred stock, $5.3 million promissory note, $4.5 million new line of credit, supply agreement, and sublease agreement was negligible because of increased interest costs.

89.    The new debt instruments doubled HGS' interest costs from $371,000 in 1995 to $661,000 (annualized).

18

90.    In 1997, HGS' interest cost increased to $728,000 and in 1998 to $937,000.

91.    The increased interest expense would exceed the net income plus management fees that Certified earned in the immediate three years before it received the $2.4 million advance from HGS.

92.    Even though RHL put in none of its own money and had no known assets to repay HGS, RHL and Certified pretended the $2.4 million sale of Certified's stock was a legitimate arms-length transaction and that the buyer truly believed that HGS was worth the purchase price of $2.4 million.

93.    RHL was formed in 1996 and was dissolved in 1998 for not filing corporate records in Delaware, the state which incorporated it.

94.    HGS' financial health had deteriorated significantly by May 1996 when Certified transferred its common stocks to RHL.

95.    The company did not generate a positive cash flow from its operating activities during 1995-1996.

96.    From January 1990 to May 1996, Certified put in about $7.8 million into the ailing HGS.

97.    HGS management determined in 1989 that common stock with 100% control over the business of HGS was worth at least $2.3 million.

98. HGS' financial statements by HGS management show that as of December 31, 1996, HGS was able to generate goodwill and that the value of this goodwill was $633,138.

99. The value of HGS' goodwill was based on the shifting of $2.4 million that HGS borrowed from Congress Financial to Certified and the transfer of the diluted common shares from Certified to RHL.

100. In 1996, these shares had no control over the business of HGS and would not share in any expected income of HGS.

101. Certified issued a dividend to itself of all of the preferred stock and the payment of the dividends on the preferred shares required all of the expected income from HGS.

102. Certified labeled this shifting of funds and transfer of shares a sale-of-stock transaction, and HGS management based its value of goodwill on these transactions, as if these took place at arms-length.

103. HGS management calculated the value of the goodwill based on the amount of money that Certified received from HGS. The common stock of HGS was transferred by Certified to RHL, requiring no cash from RHL or the depletion of none of RHL's assets.

104. This was done, in part, by using "push down" accounting whereby the

company increased the value of HGS' assets based on the purported arms-length sale price of $2.4 million.

105.   This increase in value then was used to justify the leveraged buy out with borrowings from a hard asset lender named Congress Financial.

106.   On information and belief, the Trustee alleges that, under this scheme, Certified retained a control position in HGS, through its conspiratorial relationship with RHL Inc, and used this position to obtain not only the $2.4 million in case for its stock, but large payments on its antecedent investment, that it would likely not have been repaid if the HGS had been liquidated or sold at a nominal price in 1996.

107.   The scheme by Certified was intended to mislead others who would rely upon the credit worthiness of HGS and be left unpaid after RHL and Certified drained the remaining assets out of the company for their own benefit.

108.   HGS management issued financial statements of HGS for the stub period ended December 31, 1996 and for the year ended December 31, 1997, even though there were substantial doubts about the company's ability to continue as a going concern.

109.   Those doubts include negative trends, such as continued negative cash flows from operating activities and adverse key financial ratios (HGS was delinquent in its payments of general excise and tobacco taxes.); indications of

possible financial difficulties, such as the impossibility to pay the interest and principal on the $5.3 million promissory note, possibly defaulting on Congress and Coast loans; and external matters that have occurred, such as loss of a principal customer, Times.

110. Coast Business Credit reasonably relied upon these financial statements in that the statements were a condition to its substituting in for Congress on the loan.

111. Coast substituted itself on the Congress Financial Line of Credit and increased the line to $10 million on March 27, 1998.

112. HGS' management reported as of December 31, 1996 and 1997 that HGS had bank overdrafts of $736,705 and $1,993,858, respectively, representing outstanding checks.

113. The outstanding checks include checks that should not be recorded as payments of account payables because these checks were not mailed or delivered to the vendors.

114. A review of the bank reconciliation and HGS' Check Reconciliation Register show that $780,510 of outstanding checks was not paid in January 1998, because the HGS controller did not mail them.

115. The HGS controller kept these checks in two box tops on top of his

desk, in clear view of the auditors.

116.   This event would mislead the interested parties who relied on the auditor's report as to the creditworthiness of HGS.

117.   These events eventually ended up resulting in damages to HGS and Coast in such amounts as shall be shown at trial.

118.   In an effort to conceal these wrongful acts, evidence of the same was fraudulently concealed by defendants, and the doctrines of equitable tolling and equitable estoppel apply as follows:

1. Prior to the appointment of Plaintiff as Trustee, HGS was dominated and controlled by Certified and Loeffler who was acting in concert with Certified.

2. Since HGS was dominated and controlled by said Defendants, HGS was unable to assert or to investigate its claims against defendants, and was prevented from doing so by said defendants.

3. As alleged above, defendants concealed the wrongful acts from other officers such as Wayne Yamada (President), and Kyle Kuroda (Secretary and Assistant Treasurer), directors, and creditors of HGS, and the Trustee, among other ways by forming new slates of officers and directors while concealing the matter from persons who thought they were officers and directors.

4. Said concealment was done in Honolulu, Hawaii and California at the time of the Transactions and afterwards.

5. Said concealment was done intentionally and in an effort to prevent or to delay the assertion of any claims against defendants.

6. Under the doctrines of equitable tolling, equitable estoppel, and/or fraudulent concealment, any statute of limitations applicable to Plaintiffs' claims was tolled and extended.

## Count 1: Asserted by VRG Against All Defendants Except Goodsill and Sheppard Mullin

119.   Each of the above allegations and allegations of Paragraphs 149-152, 166-169, and 204-218 are incorporated herein by VRG.

120.   Both before and after May 1996, the following individual defendants were employees, officers, directors, agents, and/or fiduciaries of Defendant Certified Grocers, and/or its wholly owned subsidiary, Grocers Specialty:

    a.    Defendant Alfred A. Plamann (Chairman of the Board of Certified Grocers);

    b.    Charles Pilliter (Senior Vice President of Certified Grocers);

    c.    Daniel T. Bane (Senior Vice President and Chief Financial Officer of Certified Grocers);  (Senior Vice President and Chief Financial Officer of Grocer Specialty);

    d.    Robert M. Ling, Jr. (General Counsel Certified Grocers);

    e.    David A. Woodward  (Treasurer and Assistant Secretary of Certified Grocery and Secretary Treasurer of Grocer Specialty);

120.   On or before January 1, 1996, Certified Grocers, determined that its $2.4 million investment in HGS had become worthless, and the long term outlook for HGS was bleak.

121.   Therefore, by May 1996, both Certified Grocers and its wholly owned

24

subsidiary, Grocers Specialty, desired the following actions be taken:

- a. Grocers Specialty sell 10,000 shares of worthless HGS stock for $2.4 million.

- b. Grocers Specialty obtained a sub lessee for its lease of a Hawaii warehouse for the amount of the lease payments which was far above the current market value at the time.

- c. Grocers Specialty obtain a $5.3 million secured note from HGS.

122. All the above desired actions were against the best interests of HGS and the other creditors and future creditors of HGS.

123. On May 13, 1996 Grocers Specialty, as the controlling shareholder of HGS, and as such, owing a duty to HGS, approved and directed that:

- a. HGS borrow the $2.4 million, advance the money through RHL, Inc. to Certified, and transfer the 10,000 shares of worthless HGS stock from Grocers Specialty to RHL, Inc.;

- b. HGS sign the sublease with Grocers Specialty at a rent far above the fair market value of the sub lease; and

- c. HGS provide Grocers Specialty with a $5.3 million secured loan.

124. On May 14, 1996, Grocers Specialty appointed the following as directors of HGS to approve, authorize and implement the actions desired by Certified Grocers and Grocers Specialty:

- a. Defendant Alfred A. Plamann  who had a conflict of interest as Chairman of the Board of Certified Grocers and as a director of HGS;

b.    Defendant Charles Pilliter who had a conflict of interest as senior Vice President of Certified Grocers and as a director of HGS;

c.    Defendant Daniel T. Bane who had a conflict of interest Senior Vice President and Chief Financial Officer of Certified Grocers, and as Senior Vice President and Chief Financial Officer of Grocer Specialty, and as a director of HGS;

d.    Defendant David A. Woodward who had a conflict of interest as Treasurer and Assistant Secretary of Certified Grocers; and as Secretary Treasurer of Grocers Specialty, and as a director of HGS;

e.    Defendant Paula Ann K. Lyman, an account clerk at HGS, who had no experience in management.

125. The newly installed Board of Directors of HGS consisting of the above described individual defendants then appointed the following officers from among the directors to further implement the desired actions:

a.    Plamann, Chairman of the Board of HGS, who had a conflict of interest as Chairman of the Board of Certified Grocers;

b.    Charles Pilliter , President of HGS who had a conflict of interest as senior Vice President of Certified Grocers;

c.    Daniel T. Bane, Senior Vice President and Chief Financial Officer who had a conflict of interest as Treasurer of Grocers Specialty;

d.    David A. Woodward, Treasurer and Assistant Secretary who had a conflict of interest as senior Vice President of Certified Grocers;

26

e.   Robert Ling, Secretary of HGS, who had a conflict of interest as Vice President, General Counsel of Certified who, in that position at Certified, directed the activities of all outside counsel of Certified.

126.   Attached as exhibit 1 is a true and correct copy of the actions taken by the Defendant officers and directors of HGS on or about May 13, 1996 that proximately injured HGS in the amount of at least $13.5 million.

127.   At the time the Defendant officers and directors took the above described actions, they all had a conflict of interest between their duties as officers and directors of HGS and officers and directors of Certified and Grocers Specialty.

128.   At the time the Defendant officers and directors took the above described actions, they knew or should have known they had a conflict of interest.

129.   At the time the Defendant officers and directors took the above described actions, they knew or should have known, that taking these actions was improper and a breach of their respective duties as employees, officers, directors, and/or fiduciaries.

130.   Subsequent to their actions as directors on or about May 13, 1996, the Defendant officers and directors took further actions and aided and abetted in further actions during the month of May and thereafter, that implemented the wrongful corporate resolutions adopted by the directors to the injury of HGS and Coast.

131.   These actions included, but are not limited to, HGS borrowing large amounts of money to fund the leveraged buyout of HGS shares from Grocers Specialty that had no value, funding above market rental payments on the sublease to Grocers Specialty, and funding payments on the $5.3 million promissory note.

132.   These and other actions implementing the above actions proximately caused the irreversible insolvency of HGS to begin and accelerate into ~~sum~~ some $13.5 million of losses.

### Count 2: Asserted by Yee Against All Defendants Except S-M and Goodsill

133.   Each of the above allegations and the allegations of Paragraphs 154-157, 171-174, and 220-235 are incorporated herein by Yee.

134.   Both before and after May 1996, the following individual defendants were employees, officers, directors, agents, and/or fiduciaries of Defendant Certified Grocers, and/or its wholly owned subsidiary, Grocers Specialty:

     a.    Defendant Alfred A. Plamann (Chairman of the Board of Certified Grocers);

     b.    Charles Pilliter (Senior Vice President of Certified Grocers);

     c.    Daniel T. Bane (Senior Vice President and Chief Financial Officer of Certified Grocers);  (Senior Vice President and Chief Financial Officer of Grocer Specialty);

     d.    Robert M. Ling, Jr. (General Counsel Certified Grocers);

e.      David A. Woodward  (Treasurer and Assistant Secretary of
        Certified Grocery and Secretary Treasurer of Grocer Specialty);

135.   On or before January 1, 1996, Certified Grocers determined that its

$2.4 million investment in HGS had become worthless, and the long term outlook

for HGS was bleak.

136.   Therefore, by May 1996, both Certified Grocers and its wholly owned

subsidiary, Grocers Specialty, desired the following actions be taken:

a.      Grocers Specialty sell 10,000 shares of worthless HGS stock
        for $2.4 million.

b.      Grocers Specialty obtained a sub lessee for its lease of a Hawaii
        warehouse for the amount of the lease payments which was far
        above the current market value at the time.

c.      Grocers Specialty obtain a $5.3 million secured note from HGS.

137.   All the above desired actions were against the best interests of HGS

and the other creditors and future creditors of HGS.

138.   On May 13, 1996 Grocers Specialty, as the controlling shareholder of

HGS, and as such, owing a duty to HGS, approved and directed that:

a.      HGS borrow the $2.4 million, advance the money through
        RHL, Inc. to Certified, and transfer the 10,000 shares of
        worthless HGS stock from Grocers Specialty to RHL, Inc.;

b.      HGS sign the sublease with Grocers Specialty at a rent far
        above the fair market value of the sub lease; and

29

    c.     HGS provide Grocers Specialty with a $5.3 million secured loan.

139.  On May 14, 1996, Grocers Specialty appointed the following as directors of HGS to approve, authorize and implement the actions desired by Certified Grocers and Grocers Specialty:

    a.     Defendant Alfred A. Plamann  who had a conflict of interest as Chairman of the Board of Certified Grocers and as a director of HGS;

    b.     Defendant Charles Pilliter  who had a conflict of interest as senior Vice President of  Certified Grocers and as a director of HGS;

    c.     Defendant Daniel T. Bane who had a conflict of interest Senior Vice President and Chief Financial Officer of Certified Grocers, and as Senior Vice President and Chief Financial Officer of Grocer Specialty, and as a director of HGS;

    d.     Defendant David A. Woodward who had a conflict of interest as Treasurer and Assistant Secretary of Certified Grocers; and as Secretary Treasurer of Grocers Specialty, and as a director of HGS;

    e.     Defendant Paula Ann K. Lyman, an account clerk at HGS, who had no experience in management.

140.  The newly installed Board of Directors of HGS consisting of the above described individual defendants then appointed the following officers from among the directors to further implement the desired actions:

    a.     Plamann, Chairman of the Board of HGS, who had a conflict of interest as Chairman of the Board of Certified Grocers;

b.    Charles Pilliter, President of HGS who had a conflict of interest as senior Vice President of Certified Grocers;

c.    Daniel T. Bane, Senior Vice President and Chief Financial Officer who had a conflict of interest as Treasurer of Grocers Specialty;

d.    David A. Woodward, Treasurer and Assistant Secretary who had a conflict of interest as senior Vice President of Certified Grocers;

e.    Robert Ling, Secretary of HGS, who had a conflict of interest as Vice President, General Counsel of Certified who, in that position at Certified, directed the activities of all outside counsel of Certified.

141.    Attached as exhibit 1 is a true and correct copy of the actions taken by the Defendant officers and directors of HGS on or about May 13, 1996 that proximately injured HGS in the amount of at least $13.5 million.

142.    At the time the Defendant officers and directors took the above described actions, they all had a conflict of interest between their duties as officers and directors of HGS and officers and directors of Certified and Grocers Specialty.

143.    At the time the Defendant officers and directors took the above described actions, they knew or should have known they had a conflict of interest.

144.    At the time the Defendant officers and directors took the above described actions, they knew or should have known, that taking these actions was improper and a breach of their respective duties as employees, officers, directors,

31

and/or fiduciaries.

145.    Subsequent to their actions as directors on or about May 13, 1996, the Defendant officers and directors took further actions and aided and abetted in further actions during the month of May and thereafter, that implemented the wrongful corporate resolutions adopted by the directors to the injury of HGS and Coast.

146.    These actions included, but are not limited to, HGS borrowing large amounts of money to fund the leveraged buyout of HGS shares from Grocers Specialty that had no value, funding above market rental payments on the sublease to Grocers Specialty, and funding payments on the $5.3 million promissory note.

147.    These and other actions implementing the above actions proximately caused the irreversible insolvency of HGS to begin and accelerate into ~~sum~~ some $13.5 million of losses.

### Count 3: Claim of VRG for Breach of of Duty by the Controlling Shareholder of HGS (Grocers Specialty) and the Controlling Shareholder's Parent Corporation (Certified)

148.    Plaintiff VRG repeats and realleges the above allegations.

149.    On or about May 13, 1996, Defendant Grocers Specialty, a wholly owned subsidiary of Defendant Certified, and its alter ego, controlled the actions of HGS through its ownership of the HGS stock.

150.   As the controlling shareholder of HGS, Defendant Grocers Specialty had a fiduciary and other duty to HGS and those creditors who had or would have a financial interest in HGS, including VRG.

151.   On or about May 14, 1996, Grocers Specialty, through its Board of Directors, took the actions necessary to implement the above cited actions that proximately caused the $13.5 million in losses to HGS. See Exhibit 2.

152.   Said actions rendered HGS insolvent.

**Count 4: Claim of Yee for Breach of of Duty by the Controlling Shareholder of HGS (Grocers Specialty and the Controlling Shareholder's Parent Corporation (Certified).**

153.   Plaintiff Yee repeats and realleges the above allegations.

154.   On or about May 13, 1996 Defendant Grocers Specialty, a wholly owned subsidiary of Defendant Certified, and its alter ego, controlled the actions of HGS through its ownership of the HGS stock.

155.   As the controlling shareholder of HGS, Defendant Grocers Specialty had a fiduciary and other duty to HGS and those creditors who had or would have a financial interest in HGS, including VRG.

156.   On or about May 14, 1996, Grocers Specialty, through its Board of Directors, took the actions necessary to implement the above cited actions that proximately caused the $13.5 million in losses to HGS. See Exhibit 2.

157.   Said actions rendered HGS insolvent.

## Count 5: Breach of Fiduciary Duties by Goodsill [*]

158.   The law firm of Goodsill, Anderson, Quinn, and Stifel ("Goodsill") represented HGS on various matters continuously from at least as early as 1994 until at least June 1997 on various legal matters, including a $7 million loan transaction, a union organization election under the direction of the NLRB, and various employee disputes.

159.   As part of his duties, Plaintiff Trustee must investigate the conduct of prior management and if appropriate assert claims against the debtor's officers and directors.

160.   Plaintiff has requested information from prior attorneys for HGS for access to files relating to actions taken by the former management of HGS.  The Goodsill law firm has repeatedly resisted providing information that could help its former client, HGS.

161.   The law firm admits that it represented Defendants Certified and Grocers Specialty in connection with the leveraged buy out and other transactions detailed in Exhibit 1 ("Transaction"), but denies that it represented HGS in any capacity involving the "Transaction"

---

[*] Count 5 (formerly 3) previously was dismissed, and is not asserted by VRG.  It is restated by Yee to preserve appeal rights.

162.   The law firm claims that even though it represented Certified in the "Transaction", it does not know who, if anyone represented HGS in the Transaction.

163.   Plaintiff has asked to interview two partners at the Goodsill law firm regarding their knowledge of the "Transaction" and the law firm's representative has refused to allow it claiming that the Plaintiff Trustee is engaged in "harassment."

164.   Defendant Goodsill is in breach of its ongoing fiduciary duty to its former client to assist in the investigation into matters relating to the Transaction.

## Count 6: Claim of VRG for  Breach of Fiduciary Duties by Robbe, Loeffler, and RHL, Inc.

165.   Plaintiff VRG repeats and realleges the above allegations.

166.   Richard Loeffler, was both the President, sole shareholder and principal of his alter ego corporation, RHL, Inc. which was a thinly capitalized corporation totally dominated by Loeffler.

167.   Both Loeffler and RHL, Inc. had a conflict of interest in the planning and execution of the Transaction in that Loeffler acted both on behalf of HGS and RHL, Inc. in the transaction and these, and latter actions related thereto, proximately caused damages in excess of $13.5 million to HGS.

168.   Robbe signed an Opinion Letter dated May 24, 1996, relating to the legality of various actions taken by the other Defendants in connection with the Transaction and more specifically HGS borrowing the $2.4 million.

169.   Robbe's opinion letter was wrongfully prepared, signed and delivered in that Robbe:  1) was clearly not authorized by HGS to sign the letter on its behalf, 2) the opinion is materially incorrect, and, 3) Robbe was practicing law in Hawaii by supplying the opinion.

## Count 7: Claim of Yee for  Breach of Fiduciary Duties by Robbe, Loeffler, and RHL, Inc.

170.   Plaintiff Yee repeats and realleges the above allegations.

171.   Richard Loeffler, was both the President, sole shareholder and principal of his alter ego corporation, RHL, Inc. which was a thinly capitalized corporation totally dominated by Loeffler.

172.   Both Loeffler and RHL, Inc. had a conflict of interest in the planning and execution of the Transaction in that Loeffler acted both on behalf of HGS and RHL, Inc. in the transaction and these, and latter actions related thereto, proximately caused damages in excess of $13.5 million to HGS.

173.   Robbe signed an Opinion Letter dated May 24, 1996, relating to the legality of various actions taken by the other Defendants in connection with the Transaction and more specifically HGS borrowing the $2.4 million.

36

174. Robbe's opinion letter was wrongfully prepared, signed and delivered in that Robbe: 1) was clearly not authorized by HGS to sign the letter on its behalf, 2) the opinion is materially incorrect, and, 3) Robbe was practicing law in Hawaii by supplying the opinion.

## Count 8: Claim of VRG for Breach of Fiduciary Duties by Fletcher Robbe

175. Plaintiff VRG repeats and realleges the above allegations.

176. Fletcher Robbe is a California attorney who represented HGS in matters relating to the transaction taking place in California, and had a conflict of interest in that he also represented RHL, Inc and Richard Loeffler in the transaction.

177. Robbe's actions were a substantial proximate cause of the losses incurred by VRG.

## Count 9: Claim of Yee for Breach of Fiduciary Duties by Fletcher Robbe

178. Plaintiff Yee repeats and realleges the above allegations.

179. Fletcher Robbe is a California attorney who represented HGS in matters relating to the transaction taking place in California, and had a conflict of interest in that he also represented RHL, Inc and Richard Loeffler in the transaction.

180.   Robbe's actions were a substantial proximate cause of the losses incurred by HGS.

## Count 10 of VRG Against Certified, Unified, and Grocers Specialty

181.   Plaintiff VRG repeats and realleges each of the above allegations.

182.   Certified, Unified, and Grocers Specialty at all relevant times were alter egos of HGS.

183.   Said defendants so controlled, dominated, and intermingled their identities and assets with HGS that it would be unjust to recognized said defendants as independent entities.

184.   There was such a unity of interest between said defendants and HGS that the separate personalities of said defendants as corporations and HGS no longer existed, and adherence to the fiction of separate corporate existences would sanction a fraud or promote injustice.

185.   Said defendants undercapitalized HGS and failed to operate HGS at arms length, and exploited HGS as a mere instrumentality or adjunct of said corporations.

## Count 11 of Yee Against Certified, Unified, and Grocers Specialty

186.   Plaintiff Yee repeats and realleges each of the above allegations.

187.   Certified, Unified, and Grocers Specialty at all relevant times were alter egos of HGS.

188.   Said defendants so controlled, dominated, and intermingled their identities and assets with HGS that it would be unjust to recognized said defendants as independent entities.

189.   There was such a unity of interest between said defendants and HGS that the separate personalities of said defendants as corporations and HGS no longer existed, and adherence to the fiction of separate corporate existences would sanction a fraud or promote injustice.

190.   Said defendants undercapitalized HGS and failed to operate HGS at arms length, and exploited HGS as a mere instrumentality or adjunct of said corporations.

### Count 12 of VRG Against Barber

191.   Plaintiff VRG repeats and realleges each of the above allegations.

192.   Defendant Bruce Barber knowingly and wrongfully submitted a false statement to a financial institution necessary to trigger a $2.4 million loan for HGS, which was immediately removed from HGS for the benefit of the Defendants.

193.   Defendant Barber later also knowingly failed to file tax forms and pay taxes owed by HGS.

194.    This was not done, even when he was in the management position that required him to do these duties.

195.    Those tax monies have since disappeared.

196.    There is pending in State Court a criminal complaint with 13 criminal counts against Barber, but he has fled the jurisdiction.

## Count 13 of Yee Against Barber

197.    Plaintiffs Yee repeats and realleges each of the above allegations.

198.    Defendant Bruce Barber knowingly and wrongfully submitted a false statement to a financial institution necessary to trigger a $2.4 million loan for HGS, which was immediately removed from HGS for the benefit of the Defendants.

199.    Defendant Barber later also knowingly failed to file tax forms and pay taxes owed by HGS.

200.    This was not done, even when he was in the management position that required him to do these duties.

201.    Those tax monies have since disappeared.

202.    There is pending in State Court a criminal complaint with 13 criminal counts against Barber, but he has fled the jurisdiction.

## Count 14 of VRG Against S-M

203.    Plaintiff VRG repeats and realleges each of the above allegations.

204.   Recent discovery allowed by the court has produced evidence that the law firm of S-M played an integral part in these plans by preparing and causing others to prepare the various transactional and corporate documents needed to facilitate Certified's scheme.

205.   A roadblock to implementing the scheme first arose in May, 1996, when Certified learned that various documents needed to be signed by appropriate HGS agents and that opinions on the appropriateness of the transaction were needed.

206.   Since the transaction and scheme were fundamentally flawed, it was unlikely that the reputable HGS agents, such as the Hawaii attorney for HGS and the Secretary, Controller, and President of HGS, would cooperate.

207.   Certified therefore did not ask for their signatures, approvals and opinions.

208.   Instead, Defendant Certified created a secret list of agents who, unbeknownst to real agents, performed the necessary acts.

209.   S-M knowingly or negligently prepared and provided the documents to facilitate a transaction that it knew or should have known was fundamentally flawed from both a business and legal viewpoint.

210.    The documentation hid the nature of the transaction and was presented by S-M to persons not qualified to execute the documents.

211.    The documentation included numerous documents transmitted to Defendant Ling as the purported Secretary of HGS and to other secret and improperly designated officers and directors of HGS, appointed only to facilitate the transaction.

212.    The documentation also included documents presented to Fletcher Robbe for approval and signature even though Robbe was not qualified to give the opinion.

213.    There were fundamental flaws in the transaction that could and did injure Coast.

214.    S-M dealt directly with the HGS officers and directors despite the fact that HGS was purportedly represented by Fletcher Robbe and that such contact normally is improper unless consented to by the other party's attorney.

215.    Alternatively, Sheppard Mullin was, in fact, acting as the HGS counsel for the transaction and only used Fletcher Robbe as a figure head in the transaction.

216.    The Secretary and other officers and directors of HGS accepted and signed all documents presented to them by S-M in the same manner that some

executives trust their own company attorneys, and accordingly signed the documentation.

217.   This was without even a cursory review without aid of counsel except S-M who also represented Certified.

218.   If, in fact, Sheppard Mullin represented HGS in the transaction it had a conflict of interest and engaged in malpractice in structuring and documenting the transaction:

> a)  There were opinion letters included by non-authorized agents.
>
> b)  There was a legal opinion on Hawaii law, by a person not licensed to practice in Hawaii.
>
> c)  There were two sets of officers and directors (one public and one secret.)
>
> d)  There were massive conflicts of interests.

### Count 15 of Yee Against S-M

219.   Plaintiff Yee repeats and realleges each of the above allegations.

220.   Recent discovery allowed by the court has produced evidence that the law firm of S-M played an integral part in these plans by preparing and causing others to prepare the various transactional and corporate documents needed to facilitate Certified's scheme.

221.   A roadblock to implementing the scheme first arose in May, 1996, when Certified learned that various documents needed to be signed by appropriate HGS agents and that opinions on the appropriateness of the transaction were needed.

222.   Since the transaction and scheme were fundamentally flawed, it was unlikely that the reputable HGS agents, such as the Hawaii attorney for HGS and the Secretary, Controller, and President of HGS, would cooperate.

223.   Certified therefore did not ask for their signatures, approvals and opinions.

224.   Instead, Defendant Certified created a secret list of agents who, unbeknownst to real agents, performed the necessary acts.

225.   S-M knowingly or negligently prepared and provided the documents to facilitate a transaction that it knew or should have known was fundamentally flawed from both a business and legal viewpoint.

226.   The documentation hid the nature of the transaction and was presented by S-M to persons not qualified to execute the documents.

227.   The documentation included numerous documents transmitted to Defendant Ling as the purported Secretary of HGS and to other secret and

improperly designated officers and directors of HGS, appointed only to facilitate the transaction.

228.   The documentation also included documents presented to Fletcher Robbe for approval and signature even though Robbe was not qualified to give the opinion.

229.   There were fundamental flaws in the transaction that could and did injure HGS.

230.   S-M dealt directly with the HGS officers and directors despite the fact that HGS was purportedly represented by Fletcher Robbe and that ~~normally~~ such contact normally is improper unless consented to by the other party's attorney.

231.   Alternatively, Sheppard Mullin was, in fact, acting as the HGS counsel for the transaction and only used Fletcher Robbe as a figure head in the transaction.

232.   Plaintiff Trustee is informed and believes that S-M and Goodsill dispute the role, if any, played by Goodsill in the transaction on behalf of Certified.

233.   The Secretary and other officers and directors of HGS accepted and signed all documents presented to them by S-M in the same manner that some executives trust their own company attorneys, and accordingly signed the documentation.

234.  This was without even a cursory review and without aid of counsel except S-M who also represented Certified.

235.  If, in fact, Sheppard Mullin represented HGS in the transaction it had a conflict of interest and engaged in malpractice in structuring and documenting the transaction:

   a)  There were opinion letters included by non-authorized agents.

   b)  There was a legal opinion on Hawaii law, by a person not licensed to practice in Hawaii.

   c)  There were two sets of officers and directors (one public and one secret.)

   d)  There were massive conflicts of interests.

## Count 16 of VRG Against All Defendants

236.  Plaintiff VRG repeats and realleges each of the above allegations.

237.  Defendants aided and abetted each other in committing the wrongs alleged above.

## Count 17 of Yee Against All Defendants

238.  Plaintiff Yee repeats and realleges each of the above allegations.

239.  Defendants aided and abetted each other in committing the wrongs alleged above.

## Count 18 of VRG Against All Defendants

240.   Plaintiff VRG repeats and realleges each of the above allegations.

241.   The Federal Deposit Insurance Corporation ("FDIC") has assigned all of its rights, title and interest in HGS defaulted note to Value Recovery Group, L.P. ("VGR" or "Plaintiff").

242.   The FDIC was appointed as Receiver of the former Southern Pacific Bank ("SPB") on February 7, 2003.

243.   SPB, through its division or subsidiary, Coast Business Credit ("Coast") extended credit to HGS.

244.   At the time of the HGS assignment by the FDIC to VRG, there remained an unpaid principal balance in the approximate amount of $2,346,270.00 plus accrued interest.

245.   The Defendants entered into a continuing conspiracy, or one or more conspiracies, aimed at obtaining money from Coast with the view that all or much of that money would be funneled to Unified or Certified, with Coast being largely or in part unpaid.

246.   Defendants aided and abetted each other in accomplishing said goal.

247.   Defendants had a duty to but failed to disclose to Coast their plan and that the promise being made by HGS to repay Coast would largely be unperformed.

248.   At all relevant times, Certified and Unified controlled HGS and its operations and were its de facto partner and alter ego.

249.   Certified and Unified were also the alter ego of Grocers Specialty.

250.   Certified and Unified further used Grocers Specialty and HGS as its agents and are responsible for their actions.

251.   As a result of the actions of Defendants, Coast was induced to loan substantial sums to HGS which loans are in part unpaid, and has been damaged in an amount to be shown.

252.   Defendants have been unjustly enriched and the court should order restitution.

## Count 19 of Yee Against All Defendants

253.   Plaintiff Yee repeats and realleges each of the above allegations.

254.   The Defendants entered into a continuing conspiracy, or one or more conspiracies, aimed at obtaining money from HGS with the view that all or much of that money would be funneled to Unified or Certified.

255.   Defendants aided and abetted each other in accomplishing said goal.

48

256. At all relevant times, Certified and Unified controlled HGS and its operations and were its de facto partner and alter ego.

257. Certified and Unified were also the alter ego of Grocers Specialty.

258. Certified and Unified further used Grocers Specialty and HGS as its agents and are responsible for their actions.

259. As a result of the actions of Defendants, HGS has been damaged in an amount to be shown.

260. Defendants have been unjustly enriched and the court should order restitution.

**Prayer for relief**

WHEREFORE, Plaintiffs pray that:

A.    The Court enter a Judgment in favor of Plaintiffs and against Defendants ordering Defendants to pay over to Plaintiffs damages in an amount to be determined at trial, plus interest, and other injuries.

B.    That the Court rescind the Transactions and Coast's Loan and the disposition of Plaintiff's proceeds and order restitution to Plaintiffs.

C.    The Court enter Judgment in favor of Plaintiffs and against Defendants for punitive damages in an amount to be proven at trial.

D.    The Court enter declaratory relief, and a temporary and permanent

49

injunction against Defendant Goodsill to reveal information to its former client in matters that it is knowledgeable regarding the Transaction. **

      E.      The Court award to Plaintiffs their reasonable attorney's fees and costs.

      F.      The Court afford Plaintiffs such other and further relief as is just and proper.

DATED:  Honolulu, Hawaii, _June 21 2004_.

As to Yee Claims:

R. Patrick Jaress, Esq.
Attorney for Plaintiff
Mark Yee

As to VRG Claims:

John Rapp, Esq.
Attorney for Plaintiff
Value Recovery Group, L.P.

---

** Language retained to preserve appeal rights.