1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF HAWAII

 3

 4    UNIFIED WESTERN GROCERS, INC.,   ) CIVIL NO. 03-00336HG
                                       )
 5                   Plaintiff,        )
                                       )
 6        vs.                          )
                                       )
 7    TWIN CITY FIRE INSURANCE COMPANY,)
                                       )
 8                   Defendant.        )
      _____)
 9

10                  TRANSCRIPT OF PROCEEDINGS

11         The above-entitled matter came on for hearing on

12    Monday, December 6, 2004, at 10:34 a.m., at Honolulu, Hawaii,

13    BEFORE:          THE HONORABLE HELEN GILLMOR
                       United States District Judge
14
      REPORTED BY:     STEPHEN B. PLATT, RMR, CRR
15                     Official U.S. District Court Reporter

16    APPEARANCES:     JOHN R. SEIBERT, ESQ.
                       JONATHAN H. STEINER, ESQ.
17                     P.O. Box 2800
                       Honolulu, Hawaii  96813
18
                                   Attorneys for the Plaintiff
19
                       WESLEY H.H. CHING, ESQ.
20                     KIM WEST, ESQ.
                       SAMANTHA M. BALL, ESQ.
21                     841 Bishop Street
                       Davies Pacific Center, Suite 1200
22                     Honolulu, Hawaii   96813

23                                 Attorneys for the Defendant

24

25
```

2

```
1    MONDAY, DECEMBER 6, 2004                    10:34 A.M.

2                         -ooOoo-

3           THE CLERK:  Civil Number 03-336, Unified Western

4    Grocers, Incorporated, and others, versus Twin City Fire

5    Insurance Company.

6           This case is called for hearing on cross motions for

7    summary judgment.

8           THE COURT:  Appearances, please.

9           MR. SEIBERT:  Good morning, Your Honor.

10          My name is John Seibert.  With me is John Steiner,

11   and we are appearing on behalf of the plaintiffs.

12          MS. BALL:  Good morning, Your Honor.

13          My name is Samantha Ball, and with me is Wesley

14   Ching.  And Kim West is available by telephone, appearing for

15   Twin City Fire Insurance Company.

16          MR. WEST:  Your Honor, this is Kim West.  I want to

17   apologize for not being able to attend in person.  I am in the

18   middle of the closing of the sale of my house, and I needed to

19   stay here in town for some of the paperwork, but thank you for

20   indulging me by telephone.

21          THE COURT:  That's perfectly all right; I don't

22   think it's a problem in this situation.

23          Good morning to you all.

24          Now, we have joint motions filed on the same day, in

25   terms of the motions for summary judgment.  Have you folks
```

---

```
 1   worked out a preference, in terms of who speaks first?
 2            MR. SEIBERT:  We have not.  As plaintiffs in this
 3   action, we had assumed we would proceed first, but that is of
 4   no great moment to us.
 5            THE COURT:  Okay, well, why don't we let the
 6   plaintiffs go ahead.
 7            MS. BALL:  Thank you, Your Honor.
 8            MR. SEIBERT:  Thank you, Your Honor.
 9            As a preliminary point in connection with this
10   declaratory judgment action, we do have two sets of
11   plaintiffs.
12            We have what we have been calling the "corporate
13   plaintiffs" and the "individual plaintiffs," and I mention
14   that because the directors and officers' liability policy at
15   issue in this case only covers the individual plaintiffs, but
16   the underlying lawsuit brought by the bankruptcy trustee,
17   Mark Yee, and his co-plaintiff, ERG, sued both groups of
18   plaintiffs, and there are some claims, as we will explain in a
19   moment, that are more clearly directed to the corporate
20   plaintiffs as opposed to the individual plaintiffs.
21            Number two, I would note that the parties will be
22   talking a bit this morning about an entity called Hawaiian
23   Grocery Stores, Limited, or HGS, which is the bankruptcy
24   estate.  HGS has taken two different forms in the underlying
25   lawsuit.  HGS, prior to the time it was sold by the corporate
```

4

1    plaintiffs in May of '96, and then its status after it was

2    sold in May of '96 until it petitioned for bankruptcy.

3           Twin City's has taken the position that there is no

4    coverage under the directors and officers' policy for the

5    individual plaintiffs because of two reasons.

6           They say, on the one hand, that the entirety of the

7    trustees' lawsuit is really a suit for restitutionary relief

8    to disgorge and return ill-gotten gains which traditionally

9    are not considered insurable losses.

10          And then they say, even if we are wrong about that,

11   there's a policy exclusion called Exclusion F, which would

12   kick in to preclude coverage for all of the individual

13   plaintiffs.

14          As to the first point, obviously, we made a number

15   of arguments in our briefs, and I just want to address one

16   this morning.  And that is, when the court takes a look at

17   a fair reading of the trustee's complaint, it's clear that,

18   far from what Twin City says, the entirety of his suit is not

19   about restitutionary relief; in fact, restitution is really

20   only a minor part of his lawsuit, and it is only directed to

21   the plaintiffs in this declaratory judgment action.

22          Mr. Yee claims that the bankruptcy estate of HGS

23   lost $13.5 million.  Presumably these are the creditor claims

24   that he is seeking to recover.  And he contends that these

25   losses were proximately caused by the conduct of the corporate

1    and individual plaintiffs in this lawsuit.

2         He never contends, in his lawsuit, that the

3    $13.5 million went into the pockets either of the corporate

4    plaintiffs in this deck action or the individual plaintiffs in

5    this deck action.

6         He does contend that some portion of the

7    $13.5 million went to the corporate plaintiffs -- Certified

8    Grocers of California and Grocers Specialty, which were

9    insurers under -- which were the companies that had owned HGS

10   before its sale.

11        Mr. Yee is vague as to how much of the $13.5 million

12   was ever transferred to Certified and Grocers Specialty.  He

13   does toss out one specific number.  He tosses out a number of

14   $2.4 million.  He says that in May of '96, when Grocers

15   Specialty sold HGS, HGS caused $2.4 million to be transferred

16   to Grocers Specialty to buy back the HGS common stock that

17   Grocers Specialty had been holding.

18        He also says that in May of '96, Grocers -- HGS

19   created a promissory note obligating itself to pay $5.3

20   million in debt to Grocers Specialty, and that it had to pay

21   interest, initially to the tune of around $337,000 a year.  He

22   never says how much in interest HGS actually paid to Grocers

23   Specialty before it had to declare bankruptcy.  It's not a

24   record in this motion, but I will simply state for the court's

25   information that the documentation seems to indicate that HGS

1    did make interest payments for about two and a half to three

2    years, totalling roughly $1 million.

3            Beyond that, Mr. Yee is rather vague and imprecise;

4    he really doesn't say with any degree of specificity what

5    other amounts of money were transferred from HGS into the

6    pockets of Certified or Grocers Specialty.

7            We are assuming he is going to contend that some

8    amounts were transferred when this lawsuit goes to trial, the

9    underlying lawsuit.  We don't know how much that is.  But our

10   position is, when you step back and you fairly look at the

11   underlying complaint, the bulk of it is for recapturing losses

12   that he says were proximately caused by the mismanagement of

13   the plaintiffs in this lawsuit, and that only a relatively

14   small portion of those lawsuits actually went into the pockets

15   of the corporate plaintiffs in this lawsuit:  Perhaps $3.4

16   million, maybe a bit more.

17           But for the bankruptcy trustee to prevail across the

18   board in his underlying suit, his major relief is going to

19   have to be a win based upon a breach of fiduciary duty theory.

20   He is going to have to recapture the bulk of that $13.5

21   million as pure tort damages.  And he makes such a claim

22   against all of the plaintiffs in Count Two of his underlying

23   complaint.  Count One is an identical count brought by BRG,

24   one of the financial creditors.

25           There is no dispute in the current deck action that

1    a claim arising from a breach of fiduciary duty on the part of

2    the individual plaintiffs is a covered claim, and therefore

3    our argument is that, even if the court were to conclude that

4    some portion of the underlying lawsuit against any of the

5    plaintiffs, including the individual plaintiffs, who are

6    seeking restitutionary relief, the bulk of it does not; it is

7    therefore covered, despite what Twin City is arguing.

8            Now, the second point and the last point that I

9    would make with respect to this aspect of the position Twin

10   City has announced for denying coverage is that, when you read

11   the bankruptcy trustee's complaint, there's nothing in it that

12   alleges that the individual plaintiffs, that is, the insureds

13   of this company, that they personally were enriched by the

14   $2.4 million or the interest payments that were made on the

15   promissory note.  The complaint always alleges that those

16   payments were funneled to Grocers Specialty.

17           Lest there be any doubt, we submitted the trustee's

18   response to a request for admissions that we had submitted to

19   him in the underlying lawsuit.  That's been submitted as

20   Exhibit M in support of our motion for summary judgment.  And

21   he was asked to admit or deny that the individual plaintiffs

22   received any payments from the transactions alleged in May of

23   '96 to have been the basis of his lawsuit.  And he said, I

24   admit that they were not the recipients of such payments.  He

25   said, on the other hand, they may have indirectly benefited

8

1    through their salaries or bonuses, but we have no record of

2    such payments.

3           So, when you combine his own admissions together

4    with the allegations that do not specifically contend that the

5    individual plaintiffs in this lawsuit personally benefited,

6    there's nothing for a court below to order them to disgorge.

7    And therefore, there is nothing about the suit below that

8    constitutes an effort to seek restitutionary relief.  The

9    entirety of the suit below against the individual plaintiffs

10    is only for pure tort damages.

11           THE COURT:  When you talk about the suit below, I

12    assume that you are talking about the suit that is taking

13    place in the district court --

14           MR. SEIBERT:  That's right.

15           THE COURT:  I mean, it's all at the same level --

16           MR. SEIBERT:  That's correct.  I should say the

17    underlying suit, as opposed to "the suit below" -- which I

18    believe now is going to be referred to Judge Real.

19           That then brings me to the second ground for denying

20    coverage, which is Exclusion F.  This is this -- for want of a

21    better term, I call it a funky exclusion, because it's sort of

22    an awkwardly drafted exclusion, but, simply put, it says,

23    we're not going to give coverage to an otherwise covered

24    director -- in this case, Daniel Bain -- for a claim arising

25    from his service with an outside entity, if the claim was

1   brought by or on behalf of the outside entity, including

2   brought by someone acting on behalf of the outside entity like

3   a trustee.

4         And so Twin City seizes on the word trustee and

5   says, well, Mark Yee is a bankruptcy trustee, therefore

6   Exclusionary F is triggered, and certainly with respect to

7   Mr. Bain, it precludes coverage.  And, in fact, Twin City goes

8   even further and says it operates to bar coverage for all of

9   the individual plaintiffs.

10        The problem is that Twin City makes the mistake of

11   thinking that the entity that Daniel Bain served as a director

12   for on the outside -- which we all agree is HGS, after its

13   sale in '96 -- that that entity is the same entity that

14   Mark Yee is now a bankruptcy trustee for.  Mark Yee is not a

15   bankruptcy trustee for HGS; he is a trustee for the bankruptcy

16   estate of HGS.  And we have cited a number of cases that

17   clearly represent a majority rule.  There are some cases that

18   go the other way, but the majority of the cases that our

19   research has come across indicate that a bankruptcy trustee

20   representing a bankruptcy estate is an entirely different

21   legal entity than the pre-bankruptcy company that sought

22   bankruptcy protection.

23        So Exclusion F is very specific:  It only operates

24   when a claim arises from a director's service for an outside

25   entity that later sues that director, or on behalf of whom a

1    lawsuit is brought.  We've relied on cases that discuss the

2    so-called insured versus insured exclusion, which is not

3    technically what we have here, but the difference doesn't make

4    any difference with regard to the importance of those

5    holdings.

6         In the insured versus insured exclusion cases, you

7    have a situation where a policy says, we the insurance company

8    will not represent both an insured who then gets sued by

9    another insured because there is the possibility for

10   collusion.

11        And these cases involve situations where a company

12   goes bankrupt, the bankruptcy trustee then brings a suit

13   against the former directors and officers of the bankrupt

14   entity, usually for breach of fiduciary duty.  And the

15   insurance companies say, whoa, we're not going to cover the

16   former officers and directors because they are being sued by a

17   bankruptcy trustee who, in essence, is the same entity as the

18   previously insured company.

19        And the courts that have looked at this, in the

20   majority, have held no.  Once the bankruptcy petition is

21   accepted, an estate is created and a trustee is appointed, he

22   represents a whole different group of interests, including

23   creditor interests; therefore, he does not have an identity

24   with the original insured entity.  That logic, we submit,

25   applies here.

1        My final point would be, even if the court were to

2    disagree and say, despite those cases, I'm going to conclude

3    that Mark Yee did bring a lawsuit on behalf of pre-petition

4    HGS, we would then ask that the court limit that holding only

5    to Daniel Bain because he was the only plaintiff who actually

6    served as a director of HGS after it was sold.  And that is

7    the entity that Twin City focuses on.  That's the time period

8    Twin City focuses on when it relies on Exclusion F.

9        We say that for two reasons:  One, there is no

10   wording in the four corners of Exclusion F that says that the

11   exclusion applies as to one director, it then applies to all

12   the others even though they never had anything to do with the

13   outside entity that is triggering the exclusion.

14       I realize Twin City relies on some California cases

15   that talk about intentional act exclusion where the policy

16   says, if an insured engages in an intentional act, there's no

17   coverage for all of the insureds, whereas the policy says, if

18   the insured engages in an intentional act, then there is only

19   exclusion -- the exclusion only applies to a particular

20   insured, and the remaining insureds have coverage.

21       The problem is, even if Hawaii's courts were to

22   embrace that doctrine -- which they have never considered --

23   the language of Exclusion F is so confusing it just does not

24   admit to that sort of application, because you -- sometimes

25   the word "a" precedes the word "director," sometimes the word

1    "the" precedes the word "director."  It's unclear whether the

2    policy is talking in the plural or in the singular, and of

3    course exclusions have to be unambiguous under Hawaii

4    insurance law to have application.

5           And, finally --

6           THE COURT:  You are making the assumption that we

7    are applying Hawaii law.

8           MR. SEIBERT:  Yes.  And we would certainly say that,

9    under Peters v Peters, Hawaii has an exceptionally strong

10   interest in applying Hawaii law.

11          And, in this case, we are dealing with a Hawaii

12   corporation that petitioned for bankruptcy protection, which

13   is litigated here.

14          Individual plaintiffs were directors and officers of

15   a Hawaii corporation.  And the interests in that situation

16   would seem to be as strong, if not stronger, than they were in

17   Peters, where you had two out-of-state residents from New York

18   who were here as tourists, a husband and wife, they get in a

19   car accident, the wife sues the husband, and the issue is, do

20   you apply Hawaii's interspousal tort immunity law, which did

21   not exist in New York?

22          And even though New York, obviously, has a strong

23   interest in preserving the marriages of its residents, the

24   Hawaii Supreme Court said Hawaii has a commercial interest in

25   making sure that the cost of renting cars doesn't go up here

1     because husbands and wives are able to sue each other for

2     damages.

3          Clearly, there is a commercial interest, as well, in

4     seeing to it that corporations that are run and operated by

5     directors and then go into bankruptcy in Hawaii are beholden

6     to Hawaii insurance law that officers and directors are

7     assumed to think is going to apply when they secure D & O

8     coverage.

9          To finish up my last point, at the very end of the

10    list of exclusions in this policy as a so-called severability

11    clause. And it says that the wrongful act of any director or

12    officer shall not be imputed to any other director or officer

13    for purposes of applying the exclusions set forth in this

14    section.

15         And that seems, to us, to say that even if the court

16    were to conclude that Exclusion F should apply to director

17    Bain for whatever he did for HGS after it was sold, the

18    exclusion should not be applied to the remaining directors.

19    And even if we were to go one step further and the court were

20    to say, you know, I am not so sure the severability clause

21    should be applied that way, at a minimum when you read the

22    severability clause in conjunction with Exclusion F, which

23    Hawaii law and, as far as I know, California law says has to

24    be done, you have to look at the policy as a whole, you end up

25    with, at most, an ambiguous situation:  Should the

1    severability clause be applied or not applied when only one
2    director out of several happens to fall within the scope of
3    Exclusion F?

4            And, again, to the extent that we submit Hawaii
5    insurance law applies, under Smith versus New England Mutual
6    Life that we have cited, an exclusions language has to be
7    absolutely unequivocal to be enforced, and under this
8    scenario, we submit it is not.

9            Thank you.

10            THE COURT:  Thank you, Mr. Seibert.

11            Ms. Ball, you are going to argue?

12            MS. BALL:  Thank you, Your Honor.

13            Your Honor, the policy at issue does not cover the
14    individual plaintiffs.  The cross motions for summary judgment
15    are based upon the underlying litigation in which the trustee,
16    Mark Yee, and Value Recovery Group, simply seek to get their
17    money back from the corporate defendants and from the
18    individual defendants.

19            In the underlying litigation, the plaintiffs want
20    the $2.4 million Coast loan rescinded.  They say so in the
21    pleading.  Value Recovery Group wants the $2.4 million back
22    from both the corporate defendants and the individual
23    defendants.

24            Similarly, in the underlying litigation, the
25    plaintiffs want the transactions, the money back, the

```
 1    $5.3 million promissory note executed in favor of the

 2    corporate defendants.  They want their money back, Your Honor.

 3    It can't be any simpler than that.  The trustees in Value

 4    Recovery say over and other in the underlying litigation that

 5    they want back that which was improperly funneled out of HGS,

 6    and they are expressly asking for it in their restitution

 7    claim set forth in the prayer --

 8              THE COURT:  Okay, but Value Recovery, how do they

 9    fit in here, in terms of -- they are not the trustee.

10              MS. BALL:  Correct.

11              Value Recovery --

12              THE COURT:  They are not even plaintiffs here, are

13    they?

14              MS. BALL:  They --

15              THE COURT:  I mean, they are not named; how do they

16    impact here?  They are not part of this lawsuit.

17              MS. BALL:  Your Honor, the underlying litigation was

18    amended, and the operative pleading is the third amended

19    complaint in which Value Recovery Group is a plaintiff.

20              THE COURT:  Okay, but that hasn't been amended in

21    the complaint here for any way that it can impact here?

22              MS. BALL:  I understand, Your Honor.

23              There's a quandary here because the plaintiffs in

24    this litigation have filed a motion for summary judgment, not

25    based on the operative pleading in the underlying litigation
```

16

1   based on the timing.  But when you take the allegations as a

2   whole -- and I'll get to the point as to the case law that

3   supports the proposition that I am presenting -- the

4   allegations as a whole demonstrate that the relief that's

5   being sought is restitutionary in nature.

6           THE COURT:  Okay, but I think you're going to have

7   to carve out Value Recovery and treat it separately, because

8   you have to have your trustee argument work before we can

9   really have the F exclusion, and I don't see how Value

10  Recovery fits in there.

11          MS. BALL:  Your Honor, I'll get to Exclusion F in a

12  moment, but just to mention that the claims that are asserted

13  in the third amended complaint are duplicative.  The trustee

14  and Value Recovery assert the same claims in all of the

15  counts.

16          THE COURT:  The other question is, the promissory

17  note is for $5.3 million, but how much of it actually went

18  over?

19          MS. BALL:  Your Honor, we don't know that.  The

20  summary judgments are based upon the allegations in the

21  complaint, not the actual amounts that were funneled, meaning

22  that whatever's pled is what we must look at to determine

23  whether or not there's coverage, not the actual amounts.

24          In the third amended complaint, the plaintiffs pray

25  that the court rescind the transactions and Coast's loan and

1   the disposition of plaintiff's proceeds and order restitution

2   to plaintiffs.  That's set forth in Exhibit 3 to Twin City's

3   motion for summary judgment, at Page 49.

4        Not only do the plaintiffs in the underlying

5   litigation ask for restitution and their money back in the

6   trustee's lawsuit, they also ask for the same money back in an

7   adversary proceeding commenced against the corporate

8   defendants for preference claims based upon an insider

9   relationship and money transferred Certified Grocers.

10        The point, Your Honor, that the plaintiffs want

11   their money back.  They want what was taken from them.  They

12   allege they were ripped off, and they want it back.  The case

13   law addresses this.

14        The plaintiffs have not incurred loss within the

15   meaning of the policy.  Hitting the point home, Your Honor,

16   courts have uniformly held that disgorgement of ill gotten

17   gains or any profit derived from that gain is uninsurable as a

18   matter of law.

19        We cite Jackie versus Crawford for that proposition,

20   and in that case, the court held that coverage is barred where

21   defendant is required to restore to plaintiff that which was

22   wrongfully acquired.  Later, in the 1992 case, Bank of the

23   West, the California Supreme Court affirms Jackie, and held

24   that it is well established that one may not insure against

25   the risk of being ordered to return money or property that has

1   been wrongfully acquired.

2          Bank of the West has been followed by other cases,

3   including the Seminal case, level three, which is cited in our

4   brief.  In level three, the United States Court of Appeals

5   held that if a director and officer policy did insure a thief

6   against the cost of him disgorging the proceeds of the theft,

7   it would be against public policy, and it would be

8   unenforceable.

9          Level three is exceptionally noteworthy for three

10  reasons and applies to this coverage litigation:

11          First, in level three, even though there was no

12  showing that the individual defendants in the underlying

13  litigation were personally enriched, Judge Posner held that

14  the loss was uninsurable as a matter of public policy.

15          Second, Judge Posner cited Bank of the West for the

16  proposition that loss within the meaning of an insurance

17  contract does not include ill gotten gains.

18          But, most importantly, Your Honor, Judge Posner

19  teaches us that regardless of how the claim is worded, if the

20  relief sought is restitutionary in character -- and he uses

21  those words -- it is not insurable loss.

22          Judge Posner teaches us not to look at labels but

23  instead to focus on whether the relief sought is

24  restitutionary in nature.

25          Applying it to our case, Your Honor, here, although

19

1   various counts are asserted, the relief that is sought is

2   restitutionary in nature.  The third amended complaint states

3   rescission, unjust enrichment, return of monies improperly

4   funneled to Certified as a result of the alleged scheme to

5   rip-off HGS of its assets, the conspiracy amongst the

6   corporate defendants and the individual defendants, and the

7   subsequent enactment of that scheme.  They want their money

8   back.

9           In their brief, plaintiff cites St. Paul Mercury

10  Insurance versus Foster for the proposition that because the

11  trustee has not alleged that the individual defendants have

12  actually realized ill-gotten gains for themself -- their

13  personal enrichment argument -- that it is possible that there

14  are other forms of relief that might be available other than

15  restitution.

16          However, St. Paul is factually distinguishable.  In

17  St. Paul, the defendants in that case faced exposure for the

18  loss of value of stock -- it's a stock drop case.  And it's

19  the stock that was owned by the ESOP.  The only way to make

20  the plaintiffs whole was through money damages; there was no

21  opportunity for restitution to apply.  There was nothing to

22  return.  There was nothing to pay back.  The stock simply lost

23  value.

24          Here, defendants can return or pay back what was

25  wrongfully taken, and the interest, and the consequences of

1   that.  And the plaintiffs want it back.  They say it over and

2   over:  They seek rescission; they want restitution; they want

3   to be made whole.

4            Under the level three case in Bank of the West, the

5   damages that they seek, even though they are called damages in

6   part and restitution in part, they are all restitutionary in

7   character.

8            Moreover, the trustee actually does allege that the

9   individual defendants were personally enriched.  At paragraph

10  260, Page 49 of the third amended complaints, plaintiffs state

11  that defendants, all of them, including the individual

12  defendants, quote, "have been personally enriched," unquote.

13  And at paragraph 77 of the fourth amended complaint in the

14  entity litigation, the trustee in Value alleged that the

15  individual defendants were personally enriched.

16           Further, in another case, Richmond Produce versus

17  Haley, 118 BR 753, at Page 757, which is a United States

18  Bankruptcy Court decision out of the Northern District of

19  California, for 1990, the court held that a trustee can

20  recover the value of the avoidable transfer from another even

21  if the trustee could not prove that the third party had

22  actually received the property transferred or its proceeds.

23  Recovery would be permitted if the third party had received,

24  quote, "some benefit" as a result of the transfer.  That's the

25  standard.

1          The Richmond Produce case teaches us that even if

2     the individual defendants were not actually personally

3     enriched by receipt of the transferred property, it's

4     restitution and it's not insurable by law.

5          Moreover, we cite the Jarvis case in our brief,

6     which holds that a continuing salary is a form of personal

7     enrichment.  There's no dispute in this case that there was

8     continuing salary flowing to Bain after the sale of HGS.

9          To conclude on the loss argument, Your Honor, and to

10    put a fine point on it, it's a matter -- it's a

11    well-established matter of law that rescission, restitution,

12    unjust enrichment and disgorgement are not insurable.  Public

13    policy holds that a decision to the contrary would violate the

14    law, it would violate public policy because the uninsured

15    corporate defendants would be allowed to retain the ill-gotten

16    gains resulting from the transaction at issue.  Such a result

17    is contrary to law as per level three and Bank of the West.

18          With respect to Exclusion F, Your Honor, we have

19    submitted quite a bit of paper on our argument, and just to

20    briefly address some of the points that were made by counsel,

21    I'll move forward.

22          It's Twin City's position that Exclusion F bars

23    coverage to all insureds because the exclusion is broadly

24    worded, and it states that there is no coverage -- or coverage

25    is precluded for any claim.  And "any claim" is defined as a

1   civil proceeding if the claim is for, based upon, arising from

2   or in any way related to the service of the director and

3   officer for an entity other than the company, meaning HGS

4   after the sale.

5          It's undisputed that Daniel Bain did serve in such

6   an outside director position for HGS after May 28, 1996.

7          Plaintiffs argue that the outside position exception

8   applies to the exclusion, and that there is coverage for all

9   of the individual defendants because of the outside position

10   exception.  However, the outside position exception states

11   that there is another exception to it; that, it doesn't apply

12   if the claim is brought by any trustee.

13          And, again, it uses broad language -- the word

14   "any."

15          Application of Exclusion F applies to all of the

16   individual directors and officers because of the broad

17   language of the exclusion.  The insurer is not liable to make

18   any payment for loss in connection with any claim arising from

19   the service of a director or officer in an outside position.

20          To address the trustee argument, Your Honor, the

21   exclusion specifically states "any trustee."  Contract law

22   tells us to give terms the meaning that a reasonable person

23   would give them.  The common use of trustee is a person in

24   whom some estate or property is vested for another.  A

25   bankruptcy trustee is a species of a trustee.  Moreover,

1    Exclusion F explicitly and without limitation applies to any

2    trustee of a company.  And "any" means every or all.

3           With respect to plaintiffs' allocation argument that

4    Exclusion F does not permit allocation, meaning that if

5    there's no coverage for Bain, there is still coverage for the

6    others, the allocation clause only becomes relevant in the

7    event of a loss involving both covered and non-covered claims,

8    whereas this action involves uncovered claims only, so the

9    allocation question is actually really moot.

10          The rationale behind Exclusion F makes sense,

11   Your Honor.  The outside position exception does not apply for

12   insured v insured claims made against the insured person

13   acting in an outside position for reasons.  First, if, for

14   example, the outside company sued an individual serving in an

15   outside position, then the company that caused the individual

16   to serve in the outside position and asserted control over

17   that person and placed them in that person (sic) could

18   manufacture litigation to "feather their own nest," so to

19   speak.  Meaning, that's exactly what's happening here.

20          Consequently, if Exclusion F does not apply across

21   the board both literally and figuratively to all of the

22   individual defendants, the corporation here, the corporate

23   defendants, will be allowed to retain the ill-gotten gains

24   while shifting the loss to Twin City.  That cannot be what the

25   policy contemplates.  That cannot be what the law

1    contemplates.

2              In addition, Your Honor, with respect to the choice

3    of law issue, Twin City submits that California law applies

4    because the corporations are all California corporations, the

5    individual corporate -- the corporate defendants.  The

6    individuals all resided in California except for one.  They

7    worked from California.

8              The scheme was concocted in California and directed

9    from California.  We have cited authority for the proposition

10   that California law applies.  But to the extent, Your Honor,

11   if you decided that Hawaii law applies, the Burlington case

12   says that you should look to the law of other jurisdictions if

13   there's any ambiguity as to which law applies.

14             The cite for the case, Your Honor -- and it came out

15   of this court -- is 383 F.3d, 940, Ninth Circuit of Hawaii,

16   2004.  And in that case, it was an appeal of Magistrate

17   Kurren's decision granting summary judgment in favor of the

18   insurer.  Per Burlington, the absence of controlling Hawaii

19   case law does not establish legal uncertainty to trigger

20   coverage.

21             Therefore, you don't automatically construe against

22   the insurer; instead, the Burlington court affirmed Magistrate

23   Kurren's order granting summary judgment and held that when

24   determining an issue of first impression in a state, a federal

25   court sitting in diversity should look to well-reasoned

1    decisions from other jurisdictions.

2            Your Honor, Twin City submits that level three and

3    Bank of the West are well-reasoned decisions and should apply

4    here to this case.

5            Your Honor, it's kind of amazing; the individual

6    defendants here are accused of ripping off HGS, and now they

7    want to take advantage of Twin City.  They are looking for

8    insurance proceeds so that they don't lose the benefit that

9    they derived from their theft.

10            I'll submit, Your Honor, subject to questioning.

11            MR. WEST:  Your Honor, may I just add one point?

12            THE COURT:  Yes.

13            MR. WEST:  On argument, counsel for the insureds

14    pointed out that there's a severability provision in the

15    policy that contains language; it says, the knowledge of one

16    director and officer shall not be imputed to the other

17    directors and officers.  And on that basis, they argue that

18    Exclusion F, if it applies at all, should only apply to Bain.

19            I just want to point out that the nonimputation of

20    knowledge wording in the severability clause is irrelevant

21    here because Exclusion F is not based on the concept of

22    imputed knowledge.  Exclusion F is based on the status of Bain

23    at the time the claims were brought against him by the

24    trustee.  So that severability language, based on non-imputed

25    knowledge wording, is simply irrelevant here because this

```
 1    exclusion is not based on the notion of imputed knowledge.

 2              Thank you.

 3              THE COURT:  Thank you.

 4              MS. BALL:  Thank you, Your Honor.

 5              THE COURT:  Now, Ms. Ball, Mr. Seibert talked about

 6    the fact that there is a tort aspect, in terms of the

 7    trustee's suit with respect to the amount of monies that's

 8    being requested -- $13.5 -- and you have gone through and

 9    listed some of the monies that have gone over to the -- from

10    HGS to Unified, but -- or Western, but you haven't really

11    dealt with that other pile of money that the trustee is asking

12    for.

13              MS. BALL:  Your Honor, if I may, the trustee is

14    asking for the sums that we have discussed, plus interest and

15    damages flowing therefrom.  According to the level three

16    decision, Judge Posner tells us that it's all one in the same.

17    If what they are asking for is essentially restitutionary in

18    character, whether you call it damages in your prayer,

19    unspecified damages is exactly what the trustee states.  It's

20    all one in the same thing:  It's restitutionary in nature.

21              In this case, in the underlying litigation, the

22    trustee is seeking to take back what was wrongfully taken, and

23    the consequences of that.

24              Your Honor, a simple example, if I may:  If I was a

25    business partner with somebody else, and we were in a jewelry
```

1  business, and we invested a good portion of our assets in a
2  very, very large, expensive diamond, and my business partner
3  stole that diamond and took it, and I sued because the
4  business eventually failed because all of our assets were
5  stripped, that suit would be restitutionary in character --
6  regardless of what the additional losses in dollars and cents
7  might have been.  What I am seeking is to take back that which
8  was wrongfully taken.
9          It's different than if an act causes some sort of a
10 circumstance that causes, for example, stock to drop, in the
11 Mercury case, in the St. Paul Mercury case; it's a different
12 scenario.  Here the trustee is alleging and there are
13 allegations that the corporate defendants and the corporate --
14 individual corporate defendants, they all conspired.  They
15 conspired to strip HGS of its assets.  And the money was
16 funneled to the corporate defendants, and the trustee leaves
17 it ambiguous in the complaint as to whether the money was
18 actually funneled directly to the pockets of the individual
19 defendants, in part.
20         In any case, what the trustee is seeking is to take
21 back that which was wrongfully taken.  So, regardless of how
22 they -- what they call it, or what it's composed of, they are
23 simply allegations, and they are restitutionary in character.
24         THE COURT:  Thank you.
25         Did you wish to speak again, Mr. Seibert?

1        MR. SEIBERT:  Yes, briefly.

2        First of all, I believe Mr. West, Kim West, is

3 incorrect in his description of the severability clause as

4 declining to impute knowledge from one director to another.

5 It doesn't even use the word knowledge; it simply says a

6 wrongful act of any director shall not be imputed to any other

7 director for purposes of applying exclusions.

8        Secondly, with respect to Ms. Ball's reference to

9 the level three case, the level three case really had nothing

10 to do with what we are dealing with here.  It involved a

11 settlement agreement in which the court said, this settlement

12 agreement represents a settlement with a group of shareholders

13 who concluded that they had sold their stock to the defendants

14 for less than it was worth, and they simply wanted to get back

15 the price difference between what they thought a fair value

16 for the their stock would be, and that which they were

17 actually given.

18        And Judge Posner said, you can call this damages,

19 but in securities litigation, it is really restitution for a

20 price differential which had ended up in the pockets of the

21 underlying defendants.

22        We don't have that here at all.  We do not have, as

23 we have said many times, at least from our side of the podium,

24 any allegation that the individual plaintiffs in this case are

25 alleged to have ended up with anything in their pockets,

1    and nor has Ms. Ball been able to explain the fact that the

2    seeming bulk of Mr. Yee's action is for damages based upon a

3    breach of fiduciary duty theory, because he always references

4    the $13.5 million as losses, not as funds that went into the

5    coffers of Certified or Grocers Specialty.  And he is in

6    essence saying, by the time Grocers -- HGS declared

7    bankruptcy, which was about three years after it had been sold

8    by Grocers Specialty, it had piled up $13.5 million in losses.

9    And his argument is, these losses were proximately caused by

10   the things that the plaintiffs in this lawsuit did.  That's a

11   breach of fiduciary duty theory.

12          Ms. Ball talks about amazing things.  The amazing

13   thing here is that the plaintiffs paid $75,000 to Twin City to

14   insure its directors and officers for claims of mismanagement

15   based upon a breach of fiduciary duty, and that is exactly

16   what we have here, and that is why we believe we are entitled

17   to coverage.

18          Thank you, Your Honor.

19          THE COURT:  Thank you.

20          Neither party has raised the issue with respect to

21   the Dizol case, in terms of whether or not the court should be

22   dealing with this declaratory judgment action, and I think it

23   is good policy for the court to note that I have looked at

24   that question, and I find that, given the fact that the

25   underlying cases are in the federal court and the issue with

1    respect to state law is not an overriding concern, that it is

2    appropriately brought here, and that it is something that the

3    court does have jurisdiction to hear.

4          Now, the next question is whether or not there is

5    California or Hawaii law applicable here.  I believe, given

6    that we have pretty much everything happening in California,

7    it should be California law that applies.  It is true that HGS

8    was a Hawaii corporation, but the other corporations -- and

9    there are a number involved -- were all California

10   .corporations.  The parties involved, the individuals, are

11   primarily California people.  And the things that took place,

12   in terms of the financial transactions and the decisions that

13   were made, took place in California.  So I believe it is

14   appropriate to apply California law.

15         Now, as to the F exclusion, the first question is

16   whether or not the trustee would be an appropriate trustee as

17   listed in the F exclusion, and I think the underlying policy

18   considerations make it appropriate to treat the trustee as a

19   trustee that would be contemplated by the Exclusion F.  And so

20   I believe that the Exclusion F does bar the claims against

21   director Bain during the period of time that -- after HGS was

22   sold.  And that's the period when the claim is made.  So I

23   believe Exclusion F is applicable there.

24         I am having a little bit of a disconnect in terms

25   of, the complaint does appear to talk about the possibility of

1    personal enrichment, and we have to go with what the complaint

2    says, not what has been proved.  We don't have anything here

3    with respect to the result.  The case isn't going to be tried

4    until next year.  And so, looking at the complaint here, there

5    is an allegation of personal enrichment.

6              And, given the position of the people who are

7    involved here, we've got CEO's, we've got chief financial

8    officers, we've got very important figures in these other

9    corporations, and, of course, it goes without saying that we

10   are only talking about the individual defendants here, because

11   that's the nature of the policy.

12             I believe that Ms. Ball is persuasive in saying that

13   what we really do have here is something that deals with the

14   looting of a company.  And the overall issue here is basically

15   one of attempting to regain something that was taken.  It is

16   unclear, in terms of how this is going to be proved, and the

17   court has spent considerable time on the companion underlying

18   cases, in terms of dealing with the facts.  I believe, though,

19   that her characterization is correct, in that this is

20   primarily a restitution situation, in terms of that's what the

21   trustee is looking for.

22             Now, with respect to the Value -- what was it called

23   again?

24             MS. BALL:  "Value Recovery Group," Your Honor?

25             THE COURT:  Yes.  I'm not making any findings with

1    respect to that.  I don't believe it would be appropriate.

2    It's outside, I think, the scope of what we have here.

3           And what I would ask, Ms. Ball, is -- I am denying

4    the plaintiffs' motion for summary judgment, and I am granting

5    the defendant's motion for summary judgment, and I would ask

6    that you draft an order consistent with what I have said here,

7    and pass it through the plaintiffs.

8           How much time do you need to do that?

9           MS. BALL:  Your Honor, we can have it done within a

10   week, if that's acceptable?

11          THE COURT:  Well, I want it to be a good one,

12   Ms. Ball...

13          MS. BALL:  Okay, Your Honor.  If you set a deadline,

14   we'll adhere to it.

15          THE COURT:  Okay.  Why don't I give you until the

16   20th, and I give you an opportunity to review it and make any

17   objections, Mr. Seibert, until the 5th of January .

18          MR. SEIBERT:  Okay.

19          THE COURT:  Because I know the holidays are coming

20   up.

21          MR. SEIBERT:  Thank you, Your Honor.

22          MR. STEINER:  Your Honor, I would just like to add

23   that we would like to get a copy of the transcript and have an

24   opportunity to review it.  I assume that time frame would give

25   us adequate time for that?

1           THE COURT:  I would think so.  Because that's two

2    weeks.  If you want, actually, how about we go to the 22nd and

3    the 8th of January?  That's probably a little more realistic.

4           So, Ms. Ball, by the 22nd; and then, by the 8th of

5    January.

6           MS. BALL:  Yes, Your Honor.

7           THE COURT:  Okay.

8           Now, any questions?

9           (No response.)

10          THE COURT:  Okay, thank you.

11          We stand in recess.

12          THE BAILIFF:  All rise, please.

13          Court stands in recess.

14          (The hearing in the above-entitled

15          cause was concluded at 11:20 a.m.)

16                   - - -

17

18

19

20

21

22

23

24

25

34

```
 1
 2
 3
 4
 5
 6
 7                              -ooOoo-
 8           I, Stephen B. Platt, Official Court Reporter,
 9    United States District Court, District of Hawaii, do hereby
10    certify that the foregoing is a true and correct transcript of
11    proceedings before the Honorable Helen Gillmor, United States
12    District Judge.
13
14
15
16
17
18
19
20                         --------------------------------
21    WEDNESDAY, DECEMBER 15, 2004   STEPHEN B. PLATT, CSR NO. 248
22
23
24
25
```